1 Christopher S. Morris, Esq., SBN 163188
2 Chanell A. Kachi, Esq., SBN 279761
  Danielle R. Pena, Esq., SBN 286002
3 MORRIS LAW FIRM, APC
4 401 West A, Suite 1820
  San Diego, CA 92101
5 Telephone:  (619) 826-8060
6 Facsimile:  (619) 826-8065
  Attorneys for Plaintiffs
7

8                 UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10                    (EL CENTRO DIVISION)
11

| | |
|---|---|
| 12 LAVERNE SAMPSON, individually and as duly appointed Administrator and Personal Representative of the Estate of CHARLES SAMPSON, SR.; JA'NEY SAMPSON, an individual; and CHARLES SAMPSON, JR., an individual,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF EL CENTRO; JAMES THOMPSON; RICHARD LOPEZ; CORY GUSTAFSON; EL CENTRO POLICE DEPARTMENT; by and through its Police Chief, JAMES McGINLEY; and DOES 1 – 50, inclusive,<br><br>Defendants. | Case No. 14-CV-1807-L (DHB)<br><br>**PLAINTIFFS' AMENDED COMPLAINT FOR:**<br>**(1) 42 U.S.C. § 1983 – 14TH AMENDMENT - - DUE PROCESS (DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED);**<br>**(2) 42 U.S.C. § 1983 – 14TH AMENDMENT - - DUE PROCESS (CUSTOM AND PRACTICE);**<br>**(3) 42 U.S.C. § 1983 – 14TH AMENDMENT - - DUE PROCESS (FAILURE TO TRAIN AND SUPERVISE);**<br>**(4) NEGLIGENT HIRING;**<br>**(5) NEGLIGENCE;**<br>**(6) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>**(7) FAILURE TO SUMMON MEDICAL CARE;**<br>**(8) DEPRIVATION OF FAMILY RELATIONSHIPS;**<br>**(9) WRONGFUL DEATH;**<br>**(10) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; and**<br>**(11) MONEY DAMAGES.**<br><br>**REQUEST FOR JURY TRIAL** |

# I.

## INTRODUCTION

On December 3, 2013, in full view of his wife Laverne, his son Chuck, and approximately 20 friends, additional family members, and neighbors, Charles "Charlie" Sampson began to slip into a coma while in the custody and care of the El Centro Police Department.  For over two hours officers saw Charlie in medical distress, Charlie was sweating profusely, shaking uncontrollably, and incapable of speaking coherently. Officers not only ignored Charlie's obvious signs of medical distress, officers Thompson, Gustafson and Lopez went out of their way to thwart the families attempts to call for medical assistance on behalf of Charlie.

Charlie had been pulled over earlier that evening on his way to redeem some lottery tickets.  He was pulled over for rolling a stop sign.  When El Centro Police Officer James Thompson ("Thompson") found a meth pipe and an old shotgun in Charlie's 1991 Dodge Ram truck, he arrested Charlie, put him in the back of his patrol car, and took him back to the Sampson home so that he could search the home. Thompson called in for back-up when he decided to conduct a "probation compliance search" at Charlie's home, among those officers were Officer Lopez ("Lopez") and Officer Gustafson ("Gustafson"). Thompson thought he had found a drug dealer.  He was wrong.  Although he had struggled with addiction for most of his life, Charlie was not a drug dealer.  Instead, Charlie Sampson was a beloved husband and father.  He was the neighborhood handyman.  He was the "favorite uncle" to over twenty nieces and nephews.  He was an avid fisherman.  And he was simply "Grampa" to his grandchildren Kendall and Jaden.

That night, as Charlie began slipping away, those he knew him could tell something was terribly wrong.  Word of his arrest and the subsequent search of the Sampson home spread like wildfire through the tightknit community of the Sampson's family and friends.  Within minutes of Charlie being brought back to the Sampson house, the front yard was full of Charlie's friends, neighbors, and family.

1

1   During the initial search of the house Charlie was put in the back of a patrol car.

2   Approximately 45 minutes to an hour later, when Charlie was taken from the patrol

3   car into the house to "show them his drug stash" as Officer Thompson and

4   Gustafson put it, it was plain to see that Charlie was in dire straits.  He was

5   sweating profusely although it was cold outside.  He could barely walk, although he

6   was strong and in good physical health.  He could barely talk.  Charlie's friends and

7   family began to plead with Thompson, Gustafson and Lopez. For over ten minutes,

8   they begged the officers to get medical attention for Charlie. This fact is not in

9   dispute.  According to the autopsy report, "it can be heard on the (MVARS) audio

10  that the family is saying that something is wrong with the decedent and stated he

11  was sick."

12          The pleas for medical attention for Charlie were met with dismissive derision

13  by Officer Thompson, Gustafson and Lopez.  In their mind, Charlie was just

14  "faking it" and "putting on a show" for the family so he would not have to go to

15  jail.  Despite the officers acknowledging Charlie's profuse sweating and difficulty

16  walking and talking, they simply said "he's nervous." After nearly 10 minutes of

17  pleading, when it became clear that the officers were not going to do anything to

18  summon medical care, the family took matters in to their own hands.  At 7:53 p.m.,

19  which, according to the autopsy report was four minutes after Charlie was removed

20  from the patrol car and taken through the yard into the house, a call was placed

21  from Chuck's phone to 911.  According to phone records, the call lasted 14

22  seconds; but according to Charlie's niece, Sharise Kiles ("Sharise"), who placed the

23  call, no one on the other end of the call ever acknowledged the call.  When the call

24  to 911 did not work, Laverne Sampson's sister, Denise Campbell ("Denise"), who

25  had worked as a dispatcher for the Imperial County Sherriff's Department, called

26  the front desk of the police department to ask them to send an ambulance.  Dispatch

27  and phone records show that this call lasted 38 seconds.  Again, according to

28  Denise, no one on the other line ever acknowledged her call.

2

1    Dispatch records and audio recordings show that at 7:54 p.m., seconds after
2    Sharise's call but before or during Denise's call– which lasted 38 seconds – Officer
3    Lopez admits to placing a call from his private cell phone to the El Centro
4    emergency dispatchers. Officer Lopez told dispatch that Charlie was "putting on a
5    bit of a show" and to "disregard any medical calls."
6    At 9:35 p.m., a police cruiser carrying Charlie Sampson, now handcuffed in
7    the back seat, pulled into the El Centro Regional Medical Center. Shortly thereafter,
8    at 9:52 p.m. that evening, Charlie was pronounced dead on arrival.
9    The Sampson family, including his widow Laverne Sampson, his daughter
10   Ja'Ney Sampson, and his son Charles "Chuck" Sampson, Jr. bring this case to hold
11   Officer Thompson, Gustafson, Lopez and the other members of the El Centro
12   Police Department who participated in Charlie's arrest, interrogation, and
13   transportation, accountable for their deliberate indifference to the medical needs of
14   their prisoner, Charlie Sampson.  No family should have to watch their father die,
15   especially when that death is a needless one.  Had Thompson, Gustafson, Lopez
16   and the others simply called for the medical attention Charlie was entitled to under
17   the Constitution, Charlie would be alive. Had the officers simply listened to the
18   pleas of the Sampson family and friends to call an ambulance, Charlie would be
19   alive. Had Lopez not called dispatch and advised them to disregard calls, Charlie
20   would be alive. Had police dispatch acknowledged their calls and heeded their
21   pleas, Charlie would be alive.
22   Instead, on the night of December 3, 2013, Thompson, Gustafson and Lopez
23   took matters into their own hands.  Acting as judge, jury, and executioner, the
24   officers chose to simply let Charlie suffer and die as his family pleaded on his
25   behalf for medical intervention. Instead of listening to the families' repeated pleas
26   for help, Gustafson, frustrated because their search was fruitless, brushed off the
27   families pleas and repeatedly said Charlie was "just nervous."  Thompson and
28   Gustafson were the officers on scene at Charlie's initial traffic stop. They witnessed

3

Charlie's demeanor, behavior, and ease of walking and talking. Evidence shows approximately 45 minutes after the officers began their search inside the house, Charlie began to slip away. They noticed his shaking, sweating and difficulty talking and walking – yet they took no action, in fact they disregarded explicit requests to take action.  Because the officers acted with deliberate indifference to the medical needs of his prisoner, Charlie Sampson, they and the police department violated Charlie's civil rights; and for this, they should be held accountable.

Charlie's representatives and surviving family members also file this action to hold defendants herein named responsible for the deprivation of their own constitutional rights and the consequential wrongful death resulting in the loss of the love and companionship of their husband and father.

## II.

## JURISDICTION

This is a lawsuit for money damages and is brought pursuant to 42 U.S.C. § 1983, et seq., and the Fourteenth Amendment to the United States Constitution, for wrongful death and violation of constitutional rights by Defendant, City of El Centro, by virtue of its long standing practice and custom of denying detainees in the custody of its police officers adequate medical care and attention.  The City of El Centro is also liable as alleged herein by virtue of its failure to train and supervise Officer Thompson, Gustafson, Lopez and the other officers who participated in the arrest and detention of Charles Sampson.  The City of El Centro is also liable by virtue of its negligent hiring of Officer Thompson who came to the city having already served as an officer with various agencies and after having been disciplined and discharged as a result of misconduct during such service.

Jurisdiction is founded on 28 U.S.C. § 1331 and 1343 and the aforementioned statutory and Constitutional provisions. Pendant state law claims for wrongful death, negligence, failure to summon medical care, negligent supervision and training and negligent hiring are alleged as well. Plaintiff invokes

4

1 | the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) to consider

2 | the state law claims.

3 | ### III.

4 | ### PARTIES

5 | This action arises from the wrongful death of Charles Sampson, who was at

6 | all times mentioned herein a resident of the City of El Centro, located in the County

7 | of Imperial, State of California.  Plaintiff Laverne Sampson was Charles Sampson's

8 | wife.  She is also a resident of the City of El Centro.  She is the duly appointed

9 | Administrator and Personal Representative of the Estate of Charles Sampson.

10 | Plaintiff Ja'Ney Sampson is the decedent's daughter.  She is a resident of Alameda

11 | County, California.  Plaintiff Charles "Chuck" Sampson, Jr. is the decedent's son.

12 | He is a resident of the City of El Centro.

13 | Defendant City of El Centro ("City") is, and at all times mentioned herein

14 | was, a public entity authorized by law to establish certain departments responsible

15 | for enforcing the laws and protecting the welfare of the citizens of the City of El

16 | Centro.  At all times mentioned herein, Defendants City of El Centro, by and

17 | through its Police Chief, Jim McGinley and Does 1-50, were responsible for hiring

18 | and selecting the police officers of the El Centro Police Department and were also

19 | responsible for overseeing the operation, management, and supervision of the

20 | individuals appointed to serve as police officers of the El Centro Police

21 | Department.

22 | The names of the individual Police Department supervisory personnel who

23 | were responsible for the hiring of Officer Thompson, Gustafson, Lopez and the

24 | other officers of the police department who directly participated in the arrest and

25 | detention of Charles Sampson, and those who were responsible for the training and

26 | supervision of Officer Thompson, Gustafson, Lopez and the other officers of the

27 | police department who directly participated in the arrest and detention of Charles

28 | Sampson, and the supervisory personnel who were responsible for the

1  establishment of a long standing policy and custom whereby detainees are refused

2  proper medical care and attention, are currently unknown to plaintiffs. As such,

3  these individuals are sued herein as DOES 1-50.

4  Defendant James McGinley, at all times herein mentioned, was Chief of the

5  El Centro Police Department. As such he was responsible for selecting and hiring

6  the sworn officers of the El Centro Police Department including Thompson,

7  Gustafson, Lopez and the other officers of the police department who directly

8  participated in the arrest and detention of Charles Sampson. He was also

9  responsible for training and supervising Thompson, Gustafson, Lopez and the other

10  officers of the police department who directly participated in the arrest and

11  detention of Charles Sampson.

12  Defendants Thompson, Gustafson, and Lopez were sworn ECPD officers at

13  the time of Charles Sampson's untimely death. These officers directly participated

14  in the actions that lead to Mr. Sampson's death.

15  The true names and capacities whether individual, corporate, associate or

16  otherwise, of defendants named herein as DOES 1 through 50 are unknown to

17  plaintiff, who therefore sue said defendants by said fictitious names. Plaintiffs will

18  amend this complaint to show said defendants true names and capacities when the

19  same have been ascertained. Plaintiff is informed and believes and thereon alleges

20  that all defendants sued herein as DOES are in some manner responsible for the

21  acts and injuries alleged herein.

22  At all times mentioned herein Defendants Thompson, Gustafson, Lopez and

23  McGinley and the other officers of the police department who directly participated

24  in the arrest and detention of Charles Sampson named herein and as DOES 1

25  through 50 were employees and/or independent contractors of Defendant City of El

26  Centro and in doing the acts hereinafter described acted within the course and scope

27  of their employment. The acts of all defendants and each of them were also done

28  under the color and pretense of the statutes, ordinances, and regulations of the City

6

1  of El Centro. In committing the acts and/or omissions alleged herein, all defendants

2  acted under color of authority and/or under color of law. Plaintiffs sue all public

3  employees named as Defendants in their individual capacities.

4         On or about February 24, 2014, Plaintiffs Laverne Sampson, on behalf of

5  herself and as the representative of the Estate of Charles Sampson, Ja'Ney

6  Sampson, and Charles "Chuck" Sampson, Jr. filed a claim with the City of El

7  Centro. On or about April 3, 2014 the claim was denied.

8                                          **IV.**

9                    **FACTS RELEVANT TO ALL COUNTS**

10        At 5:55 p.m., on the evening of December 3, 2104, Charles "Charlie"

11 Sampson, Sr. turned the key to start his 1991 Dodge Ram truck for the last time.

12 Before the night was out, hospital attendants would pronounce Charlie dead upon

13 his arrival, handcuffed in the back of a police car in the parking lot of the El Centro

14 Regional Medical Center.

15        Charlie left his house that night, anxious to redeem his winning lottery

16 scratchers at the 7-11 around the corner.  A police cruiser greeted the Dodge Ram

17 as it rolled slowly through the stop sign at the end of his block.  El Centro Police

18 Officer James Thompson ("Thompson") demanded Charlie's license intending to

19 write him a ticket for the traffic infraction.  Thompson soon discovered that Charlie

20 was on probation following a theft conviction related to illegally procured scrap

21 metal.  Although the "probation" was of the summary variety, meaning Charlie was

22 left to himself as long as he did not violate any laws and kept current on his

23 restitution payments, for reasons only known to him, Thompson had a hunch that

24 Charlie, an African-American man in his late fifties, was a drug dealer. Based on

25 his hunch, and armed with Charlie's Fourth Waiver, Thompson began to

26 aggressively investigate Charlie for what he suspected to be more serious crimes.

27 At this time, Charlie was acting, walking and talking normal. For Thompson,

28 Charlie's probation meant the unlimited right to search Charlie, the Dodge Ram,

PLAINTIFFS' AMENDED COMPLAINT

1   and the Sampson family home. During the search of Charlie's Dodge Ram, Officer

2   Gustafson and Lopez arrived on scene.

3        Charlie was placed up against the squad car as Thompson tore through the

4   Dodge Ram in search of evidence supporting his assumptions about Charlie.

5   Unfortunately for Charlie, Thompson found a small pipe in the ashtray.  This find

6   only fueled Thompson's unfounded assumptions about Charlie.  Then, in the hood

7   of his truck, Thompson found a disassembled shotgun Charlie used for hunting.

8   Thompson immediately assumed his hunch was right.  For Thompson, the shotgun

9   meant drug dealer not sportsman and only served to confirm his unfounded

10  conclusions about Charlie.  A more extensive search of the truck ensued.  However,

11  the extensive search of the truck left Thompson empty handed.  Thompson found

12  no evidence supporting his assumption that Charlie was a drug dealer.

13       Persistent and undaunted, Thompson held steadfast to his hunch that Charlie

14  was actually a drug dealer even though Charlie, a man in his late fifties, did not fit

15  the typical description of a drug dealer.  Unfazed by the dearth of evidence in the

16  truck, Thompson assumed that a search of Charlie's house would turn up the cache

17  of cash, drugs, and weapons he *just knew* existed.  Because Charlie had waived his

18  right to be protected from illegal searches and seizures as a result of his conviction,

19  a "hunch" was all Thompson needed to go through the Sampson family home, inch

20  by inch, in search of Charlie's illegal stash of street drugs. According to the autopsy

21  report, at 6:42 p.m., Thompson placed Sampson in the rear of his patrol car *without*

22  *handcuffs* and took him back to the Sampson family home.

23       In order to conduct a thorough and complete search of the Sampson

24  residence, Thompson called in reinforcements.  Officer Gustafson assisted

25  Thompson with his initial clearance and search of the house while Lopez stayed

26  outside to "monitor" Charlie and his family and friends that had gatherd outside the

27  house. When their initial search came back fruitless, Thompson's then brought in

28  the drug sniffing canine squad.  As the search began, Charlie remained locked in

8

1   the back of the squad car. According to a report written by California Highway

2   Patrol Officer Robert Rodriguez, the canine search came back negative.

3        The County Medical Examiner has reviewed the evidence in this case and

4   parts of his report have been turned over to the Sampson family.  According to the

5   autopsy report, the video monitor inside Thompson's patrol car was turned on

6   during the detention of Mr. Sampson.  According to the report, the video shows

7   Charlie, already detained and in the back of the patrol car, putting something in his

8   mouth.  Based on the findings of the toxicology report, it appears that the substance

9   was methamphetamine.  How it was that Officer Thompson placed him in the patrol

10  car without finding the methamphetamine is unclear.  Why he placed him in the

11  back of the patrol car *without handcuffs,* which is contrary to department policy, is

12  a mystery.  According to the report, from that point forward the effects of the drug

13  are clearly evident on Charlie's face.  The report states, "From that point on, the

14  decedent can be seen beginning to sweat, his cheeks become glossy, his eyes begin

15  to change.  As the video goes on, the decedent begins to move more and becomes

16  fidgety.  As time passed by you could see the decedent's facial expressions and

17  facial features change to what appeared to be that of being under the influence of a

18  controlled substance."

19       Charles Sampson Sr. was blessed to have come from a large family.  Many of

20  his brothers and sisters and their children live in close proximity to the Sampson

21  family home.  Word of Charlie's arrest by the side of the road had traveled quickly.

22  Charlie's niece Shondra Scott ("Shondra"), who was the first to spot Charlie as he

23  stood along the police car while Thompson ransacked Charlie's truck, had called

24  Charlie's wife Laverne.  Laverne, who had just said goodbye the Charlie as he left

25  the house with his winning lottery tickets in hand, called her son Charlie Jr.

26  ("Chuck"), and her sister Denise Campbell ("Denise"), Shondra's mom.  As the

27  news about Charlie's arrest spread, various members of Charlie's family converged

28  on the scene.  They arrived to see Charlie, locked in the back of Thompson's car,

9

1    parked in front of the Sampson home.

2           Soon after Thompson had arrived at the Sampson home with Charlie

3    unhandcuffed in the backseat, the canine investigation team arrived at the scene.

4    The dogs were quickly dispatched to search for the drugs Thompson was sure they

5    would find.  For nearly an hour, Charlie languished outside in the dark as the drug

6    dogs roamed freely throughout the Sampson home.  To his chagrin, Thompson and

7    Gustafson's hopes of a drug bust went unfulfilled.  The dogs found nothing.

8    Unconvinced by the futile efforts of the drug sniffing dogs, Thompson and

9    Gustafson remained steadfast in their belief that Charlie's stash of street drugs was

10   still there in the house waiting to be discovered.  Thompson was still convinced that

11   a more extensive search of the Sampson home would yield the illicit stash he *just*

12   *knew* was there.

13          Thompson once again made a call for even more back up.  Various agencies

14   arrived on the scene and began assisting Thompson and Gustafson with their "big

15   bust."  These agents were a part of the highly regarded Border Enforcement

16   Security Team (BEST), which included agencies such as Homeland Security

17   Investigations, Immigration and Custom Enforcement, Calexico Police Department,

18   US Border Patrol, Drug Enforcement Administration, Customs and Border

19   Protection and Imperial Police Department.  The BEST officers assisted the El

20   Centro officers in searching Charlie's house.  But just like Thompson and the

21   canine search squad, the BEST officers found no drugs. At this time, during their

22   search, Officer Gustafson made multiple trips to the patrol unit in an attempt to

23   learn from Charlie the location of his drugs. Gustafson witnessed Charlie's rapid

24   decline, and not only did nothing, he denied the help requested by the family. While

25   the fruitless effort to locate drugs went on, frustrating Gustafson and Thompson,

26   Charlie began to slip into medical crisis.  His family members on the scene could

27   see that something was terribly wrong with Charlie.  They grew alarmed as they

28   could see that he was shaking as he sat in the back of Thompson's car.

                                                    10

PLAINTIFFS' AMENDED COMPLAINT

1    Thompson and Gustafson, undaunted by the fruitless results of their initial
2    search, the canine search, and the even more extensive search conducted by the
3    BEST officers, were now more convinced than ever that all that was lacking was
4    more law enforcement diligence.  They was sure that an aggressive direct
5    interrogation of Charlie, to be conducted by Thompson and Gustafson, at the
6    Sampson's family dining room table, would yield the drugs they so desperately
7    sought.  At 7:49 p.m., approximately one hour after Charlie had been first placed in
8    the patrol car, Thompson and Gustafson removed Charlie from the back of the
9    patrol car and led him into the house for more interrogation.  Charlie's family, now
10   assembled in the front yard, was alarmed and frightened by what they saw when the
11   officers moved Charlie from back of the police car to inside the house.  Instead of
12   the vigorous and robust "Uncle Charlie' they had come to know and love, the figure
13   they saw exiting Thompson's squad car was anything but.  The man they saw
14   getting out of the car shaking and quivering, struggling to walk, could not be their
15   beloved Uncle Charlie. Charlie was unable to walk without the assistance of two
16   officers.

17   Charlie's family begged and pleaded with the officers to take heed of
18   Charlie's rapidly deteriorating condition.  As Charlie was unable to walk; two
19   police officers dragged him inside the house.  As he walked by, with no shoes and
20   his toes curled beneath him, his son Chuck asked his father what was wrong.
21   Chuck remembers his dad simply telling him, as he shivered and struggled to walk,
22   that he did not know what was happening and that "he was just cold."

23   According to the autopsy report, the video from the patrol car verifies what
24   the witnesses recall about their reaction to what they saw.  The report states that, "It
25   can be heard on the audio that the family is saying that something was wrong with
26   the decedent and stated he was sick." The officers dismissed these pleas and
27   repeatedly said "he's just nervous."

28   When it became clear that Thompson, Gustafson and their recruits were not

11

going to summon medical help, Charlie's niece Sharise Kiles ("Sharise") took matters into her own hands. She told the officers that if they were not going to call 911, she would. When they still refused, Sharise used Chuck's phone to call 911. Attached hereto as Exhibit 1 is a screen shot from Chuck's phone showing a call to 911 from his phone lasting 14 seconds. Even though the screen shot shows the call lasted 14 seconds, Sharise reports that she never heard a live body on the on the other end.

Evidence shows, seconds after Sharise's call, Officer Lopez placed a call too. However, instead of requesting the much needed medical assistance for Charlie, Officer Lopez advised El Centro dispatchers to disregard any medical calls from Charlie's residence. Laverne's sister Denise Campbell had worked as a dispatcher for the Imperial County Sheriff's Department and knew the direct number to the front desk of the department. Her phone records, attached hereto as Exhibit 2, show that she placed a 38 second phone call to the department at 7:53 p.m. that night. As soon as she began to explain where she was and what was happening, the phone line went dead. Lopez' attempt to advise dispatch to ignore the calls from the family worked.

As the kitchen table interrogation began, Charlie's wife Laverne immediately realized that Charlie was suffering from what appeared to her to be a medical emergency. Having been married to Charlie for over forty years, she knew something was terribly wrong. Charlie could not coherently answer the questions that were being posed. She immediately implored Thompson and Gustafson to call an ambulance for her husband. She begged them repeatedly, as did her sister Denise, to call the paramedics. The officers met the family's entreaties with derision. Instead of a call for medical help, Thompson simply responded by smugly telling the family that Charlie was "fine," that he was just "faking it" and that he was "putting on a show for his family because he does not want to go to jail." Gustafson acknowledged Charlie's sweating and shaking but said "he's just

12

1   nervous." As Charlie's life slipped away in slow motion in front of his helpless

2   family, Thompson, Gustafson and Lopez not only refused their repeated requests to

3   summon medical help, they in fact impeded them by telling dispatch to disregard all

4   medical calls.

5          The results of the kitchen table interrogation were as fruitless as the results of

6   the numerous searches that preceded it.  During the searches and the interrogation

7   not one member of the Sampson family did anything to impede the efforts of the

8   officers.  At one point, Thompson and Gustafson found the family safe.  At

9   Thompson's request, Laverne opened the safe hopeful that she could convince

10  Thompson that there were no drugs in the house anywhere.  When she opened the

11  safe, instead of cocaine and methamphetamine Thompson only found birth

12  certificates and passports.  Finally, after Charlie had been detained for almost *three*

13  *hours*, and after repeated requests for medical help had been denied, Thompson

14  was forced to acknowledge what the Sampson family had known all along; namely,

15  that Charlie was not a drug dealer.

16         Angry and embarrassed, at 8:33 p.m. Thompson and Gustafson lifted Charlie

17  from his seat at the kitchen table to take him back to the squad car for booking,

18  after all Charlie had violated the terms of his probation by being in possession of

19  the shotgun.  Propping Charlie up on his shoulder, Thompson walked past the

20  members of the Sampson family that had assembled in the front yard.  As he did, he

21  was met with pleas and appeals to call for medical help.  Again, the family's

22  requests were met with smug derision.  Charlie's niece Sharise, is a registered

23  nurse.  She implored Thompson to at least let her take his vitals as she could see

24  that Charlie was slipping fast.  When he refused, she even told the officers that they

25  could search her before she approached Charlie.  Thompson and Gustafson refused,

26  telling her, again, that Charlie was just faking it.

27         At that point in time, Charlie had been in police custody for almost three

28  hours.  He had been in need of serious medical assistance for an hour and 43

13

minutes.  As the officers dragged Charlie outside to put Charlie in the back of the squad car, Charlie, in an attempt to find a moment to take his breath, tried to sit on a lawn chair outside of his fenced lawn. The officers yanked Charlie causing Charlie to jerk and knock over the lawn chair. When the officers put Charlie inside the patrol unit he helplessly slumped over.  Thompson and Gustafson simply lifted his bare feet into the car and walked to the driver's seat.  As he walked around the car, Laverne Sampson looked Thompson in the eyes and told him, "If anything happens to my husband tonight it's on you!"  Thompson simply replied, smug as ever, holding out his name tag for all to see, that she needed to make sure to get his name right and this it was spelled "T-H-O-M-P-S-O-N."

`        Against ECPD policy, Charlie, being in medical distress or observed to be under the influence, according to the autopsy report, was taken to the El Centro Police Station for booking instead of the hospital.  The report states that "While at the police department the decedent was sweating profusely and stating that he was cold."  At 9:20 p.m. he was placed in the back of Officer Donahue's patrol car for transportation.  Officer Donahue, upon noticing Charlie's condition, including the fact that he could not walk, immediately requested that he be given permission to transport him to a hospital.  At no time did Officer Thompson, Gustafson or Lopez take any steps to address Charlie's obvious medical distress; instead their priority was to write their reports and go home.  While trying to get Charlie in the patrol unit, it took three officers to drag Charlie to the car, prop him in the back seat and carry his legs into the car. Officer Donahue took Charlie directly to the hospital.

They pulled into the parking lot of El Centro Regional Medical Center at 9:35 p.m.  According to the report, Charlie, who had been breathing heavily when he was first placed in the car, had become quiet shortly thereafter.  At 9:52 p.m. medical staff at the hospital pronounced Charlie dead.

At approximately 9:30 p.m., Laverne called the jail to check on the condition of her husband.  She was terrified to hear that her husband had never arrived at the

14

jail.  She then called the El Centro Police Department and was told that her husband was taken to jail despite the dispatcher knowing Charlie had already passed away.  Determined to find her husband, and knowing he wasn't at the jail as the dispatcher represented, Laverne called the hospital and was told that she needed to come down right away.  When she arrived at the hospital her heart skipped a beat when she saw the police cruiser parked in the emergency space.  She was greeted by various members of the El Centro Police Department including Sargent John Seaman.  She was led to a room where she was forced to wait for over a half for any information about her husband.  After this interminable wait, Laverne was finally allowed into the room where she saw her husband's lifeless body strapped to a gurney.  The only information given to Charlie's wife Laverne is that Charlie was "unresponsive" when he arrived.

She returned home that night no longer connected to the man with whom she had shared her life the past four decades.  As she headed towards her empty home, she passed Charlie's Dodge Ram and seeing it, she began to sob.

## FIRST CAUSE OF ACTION

### 42 U.S.C § 1983 – 14th Amendment -- Due Process

### [Against Thompson, Gustafson, Lopez and Does 1-50 –

### Deliberate Indifference to a Serious Medical Need]

(Brought by the Estate of Charles Sampson, by and through its Administrator, Laverne Sampson)

Plaintiff realleges and incorporates by reference the foregoing paragraphs stated above as though fully set forth herein.

A detainee's constitutional right to adequate medical care is provided for by the Due Process Clause of the Fourteenth Amendment.  The Due Process Clause of the Fourteenth Amendment "imposes, at a minimum, the same duty the Eighth Amendment imposes:  persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs."  *Gibson v.*

15

1   *County of Washoe* (9th Cir. 2002) 290 F.3[rd] 1175, 1187.  A medical need is serious
2   "if the failure to treat the condition could result in further significant injury or the
3   'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith* (9th Cir., 1992)
4   974 F.2d 1050, 1059.  An official acts with deliberate indifference if he "knows of
5   and disregards an excessive risk to inmate health or safety."  *Gibson*, 290 F.3[rd] at
6   1188-1189.

7          That Charlie Sampson was in serious medical distress was obvious to his
8   wife Laverne, his son Chuck, and to his niece Sharise.  In fact, it was clearly
9   obvious to anyone that was there that fateful night.  By failing to provide the
10  medical care and attention Charlie needed to survive, Officer Thompson,
11  Gustafson, Lopez and the other officers of the police department who directly
12  participated in the arrest and detention of Charles Sampson and failed to intervene,
13  named herein as Does 1-50, were deliberately indifferent to a serious medical need
14  in violation of the Due Process Clause of the Fourteenth Amendment.  It was clear
15  that Charlie's condition, without additional medical treatment and observation,
16  would result in further significant injury and the unnecessary and wanton infliction
17  of pain.  Charlie's death was ultimately caused, and was a direct result of, the
18  decision made by Thompson, Gustafson, Lopez and the other officers who directly
19  participated in the prolonged detention and interrogation of Charles Sampson to
20  refuse to provide or summon the medical attention that Charlie so desperately
21  needed.

22         In doing the acts and/or omissions herein alleged, defendants were
23  deliberately indifferent to the serious medical needs of Charles Sampson which
24  caused the unnecessary infliction of pain and physical injury on Charlie, resulting in
25  his untimely death. The actions and inactions of Thompson, Gustafson, Lopez and
26  the other officers of the police department who directly participated in the arrest
27  and detention of Charles Sampson resulted in the violation of Charlie's rights under
28  the Due Process Clause of the Fourteenth Amendment of the United States

16

1    Constitution.  As a result thereof, plaintiff is entitled to damages pursuant to 42

2    U.S.C. § 1983 in an amount to be proven at trial.

3         The aforementioned acts and/or omissions of the defendants were reckless

4    and/or accomplished with a conscious disregard of Charles Sampson's rights

5    thereby entitling plaintiff to an award of exemplary and punitive damages according

6    to proof.

7                          **SECOND CAUSE OF ACTION**

8              **42 U.S.C § 1983 – 14th Amendment Due Process Clause**

9         **[Against Defendant City of El Centro and Defendant McGinley in his**

10                  **Individual Capacity – Custom and Practice]**

11         (Brought by the Estate of Charles Sampson, by and through its Administrator,

12                               Laverne Sampson)

13         Plaintiff realleges and incorporates by reference the foregoing paragraphs

14   stated above as though fully set forth herein.

15        The City of El Centro Police Department has a long standing custom and

16   practice of failing to provide adequate medical attention for detainees in the custody

17   of its officers.  This long standing custom and policy is pervasive and continuous.

18   Charlie's deprivation of his clearly established rights was caused by the well-

19   entrenched practice and custom of the El Centro Police Department to consciously

20   and intentionally deny its detainees proper medical care.  A city is liable for

21   constitutional deprivations where a plaintiff shows "the existence of a widespread

22   practice that … is so permanent and well settled as to constitute a 'custom or usage'

23   with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

24        This policy is evidenced by the failure of *any* officer of the El Centro Police

25   Department, outside of Officer Donahue, to address the serious and obvious

26   medical needs of decedent.  In furtherance of this policy, during the three hour

27   detention of decedent in this matter, Office Thompson, Gustafson, and Lopez said

28   that decedent "was just faking it," "nervous," "putting on a show" and that was

17

1   something "they all did to avoid going to jail."  This policy was ratified by Police

2   Chief McGinley as evidenced by its long standing and pervasive nature.  Upon

3   information and belief, discovery will reveal that there is an inordinate number of in

4   custody medical conditions left untreated by the officers of the El Centro Police

5   Department.  This policy is so wide spread and pervasive that it has become

6   generally understood to form part of the unofficial "common law" of the El Centro

7   Police Department.  This policy and custom was a direct contributing factor to

8   Charlie's constitutional deprivations.

9         In doing the acts and/or omissions herein alleged, and in acting pursuant to

10   this unofficial policy, defendants were deliberately indifferent to the serious

11   medical needs of Charlie Sampson which caused the unnecessary infliction of pain

12   and physical injury on Charlie, resulting in his untimely death. The actions and

13   inactions of the defendants resulted in the violation of his rights under the

14   Fourteenth Amendment of the United States Constitution.

15         The aforementioned acts and/or omissions of defendants in violating

16   plaintiff's civil rights were the direct and proximate result of policies, procedures

17   and practices/customs of defendants as alleged herein.

18                          **THIRD CAUSE OF ACTION**

19               **42 U.S.C § 1983 – 14th Amendment Due Process Clause**

20         **[Against Defendant City of El Centro and Defendant McGinley in his**

21                  **individual capacity – Failure to Train and Supervise]**

22         (Brought by the Estate of Charles Sampson, by and through its Administrator,

23                                Laverne Sampson )

24         Plaintiff realleges and incorporates by reference the foregoing paragraphs

25   stated above as though fully set forth herein.

26         Pleaded in the alternative, Charlie's untimely and unnecessary death was

27   caused by the Police Department of the City of El Centro's failure to adequately

28   train and supervise its officers to recognize the signs and symptoms of medical

18

distress prior to sending them into the field where they are likely to encounter detainees in serious medical distress.  Once they are placed into the field, police officers of the El Centro Police Department are not adequately supervised and instructed on how to detect the signs and symptoms of serious medical conditions including overdose.  In fact, evidence shows El Centro Police Department doesn't have a medical policy pertaining to detainees. This abject failure was a direct contributing factor in the untimely death of Charles Sampson.

This failure to train demonstrates a deliberate indifference to the rights of its detainees.  This abject failure to train and supervise is evidenced by the failure of *any* officer of the El Centro Police Department, outside of Officer Donahue, to address the serious and obvious medical needs of decedent.  In furtherance of this policy, during the three hour detention of decedent in this matter, Officer Thompson, Gustafson, and Lopez said that decedent "was just faking it," "putting on a show" and that was something "they all did to avoid going to jail."  This policy was ratified by Police Chief McGinley as evidenced by the acts and omissions alleged herein.  Upon information and belief, discovery will reveal that there is an inordinate number of in custody medical conditions left untreated by the officers of the El Centro Police Department.  This failure to train and supervise was a direct contributing factor to Charlie's constitutional deprivations as alleged herein.

In doing the acts and/or omissions herein alleged as a result of the department's failure to train and supervise, defendants, and each of them, were deliberately indifferent to the serious medical needs of its detainees like Charles Sampson which caused the unnecessary infliction of pain and physical injury on Charlie, resulting in his untimely death. The actions and inactions of the defendants resulted in the violation of his rights under the Fourteenth Amendment of the United States Constitution.

///

///

19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOURTH CAUSE OF ACTION**

**Negligent Hiring**

**[Against Defendant City of El Centro and**

**Defendant McGinley in His Individual Capacity, and DOES 1-50]**

(Brought by the Estate of Charles Sampson, by and through its

Administrator, Laverne Sampson)

Plaintiff realleges and incorporates by reference the foregoing paragraphs stated above as though fully set forth herein.

Upon information and belief, Defendant Officer Thompson has been a police officer at various other police departments in California.  Upon information and belief, Officer Thompson has a history of misconduct and discipline during his tenure(s) at these agencies.  During the hiring and screening process, the officials within the El Centro Police Department and/or the El Centro Personnel Department, including Police Chief James McGinley, either chose to deliberately ignore and minimize this history of discipline and made the decision to hire Officer Thompson regardless of his checkered past or through their own negligence failed to adequately investigate Officer Thompson's checkered employment history. Personnel responsible for the hiring of Officer Thompson either knew or should have known that Officer Thompson posed a substantial risk to his future detainees. This failure to adequately screen and investigate Officer Thompson created a foreseeable risk to detainees of the El Centro Police Department including decedent Sampson.  This failure to adequately screen and investigate Officer Thompson was a proximate and foreseeable cause of the untimely death of Charles Sampson.

**FIFTH CAUSE OF ACTION**

**Negligence**

**[Against Officer Thompson, Gustafson, Lopez and DOES 1-50]**

(Brought by the Estate of Charles Sampson, by and through its

Administrator, Laverne Sampson)

20

1  Plaintiff realleges and incorporates by reference the foregoing paragraphs
2  stated above as though fully set forth herein.
3  Defendants, and each of them, have a duty to act with the requisite amount of
4  skill and diligence necessary to protect the health and physical safety of the
5  detainees with whom they come into contact during their duties as police officers
6  for the El Centro Police Department.
7  Defendants were negligent and their conduct fell below a reasonable standard
8  of care when they failed to discharge their duties as custodians to Charles Sampson.
9  It was foreseeable that as a result of defendant's acts and omissions, as described
10 above, Charles Sampson's medical condition and methamphetamine ingestion
11 would worsen if left untreated, resulting in his physical injury, suffering, and death.
12 Defendants' breach proximately caused injuries and damages to Charles Sampson
13 as alleged herein.

### SIXTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### [Against Officer Thompson, Gustafson, Lopez and DOES 1-50]

(Brought by Laverne Sampson, and Charles "Chuck" Sampson, Jr.
individually)

19  Plaintiff realleges and incorporates by reference the foregoing paragraphs
20 stated above as though fully set forth herein.
21 Under California law, a cause of action for intentional infliction of emotional
22 distress exists when there is (1) extreme and outrageous conduct by defendant with
23 the intention of causing emotional distress; (2) the plaintiff's suffering of severe or
24 extreme emotional distress; (3) actual and proximate causation of the emotional by
25 the defendants' outrageous conduct.
26 As set forth herein, the medical needs of Charles Sampson were plainly
27 evident.  According to the report, the signs and symptoms of acute
28 methamphetamine overdose are clearly seen on the video tape.  Those present that

21

night, including his wife and son, knew that Charlie was in immediate need of medical care.  Officer Thompson, Gustafson, Lopez and the other officers of the police department who directly participated in the arrest and detention of Charles Sampson, knew or should have known that they needed to take reasonable steps to summon medical care for Charlie.  By failing to adequately summon medical care, Charlie suffered and died in full and plain view of his loving family.  The conduct of Officer Thompson, Gustafson, Lopez and Does 1-50 was despicable and heartless.  By allowing Charlie to suffer and die in front of his family, Thompson, Gustafson, Lopez and Does 1-50 intended to cause severe emotional distress to Charlie's family including his wife Laverne and his son Chuck.  As such, Officer Thompson and Does 1-50 are liable to Laverne and Chuck for their severe emotional distress arising out of the events of December 3, 2013.

**SEVENTH CAUSE OF ACTION**

**Failure to summon medical care**

**[Against Officer Thompson, Gustafson, Lopez,**

**City of El Centro and DOES 1-50]**

(Brought by the Estate of Charles Sampson by and through its

Administrator, Laverne Sampson)

Plaintiff realleges and incorporates by reference the foregoing paragraphs stated above as though fully set forth herein.

*California Government Code § 845.6* creates an affirmative duty for public employees "to furnish or obtain medical care for a prisoner in his custody." This provision also makes the public entity itself liable where the public employee is acting within the course and scope of his employment and the employee knows or has reason to know that medical care is needed.

As set forth herein, the medical needs of Charles Sampson were plainly evident.  According to the report, the signs and symptoms of acute methamphetamine overdose are clearly seen on the video tape.  Those present that

22

night, including his wife and son, knew that Charlie was in immediate need of medical care.  Officer Thompson, Gustafson, Lopez, and the other officers of the police department who directly participated in the arrest and detention of Charles Sampson, knew or should have known that they needed to take reasonable steps to summon medical care for Charlie.  Not only did officers fail to adequately summon medical care, Officer Thompson, Gustafson Lopez, Does 1-50, and the City of El Centro went out of their way to ensure Charlie did not get the medical care his family was pleading for. For the reasons above, the defendants are liable for the wrongful and untimely death of Charles Sampson.

## EIGHTH CAUSE OF ACTION

### 42 U.S.C § 1983 – Due Process – Deprivation of Familial Relationships
### [Against Defendant Officer Thompson, Gustafson, Lopez, City of El Centro and DOES 1-50]

(Brought by Laverne Sampson, individually, Ja'Ney Sampson, individually, and Charles "Chuck" Sampson, individually)

Plaintiff realleges and incorporates by reference the foregoing paragraphs stated above as though fully set forth herein.

Liability for deprivation of familial relationship exists where a "Defendant's conduct shocks the conscience …. What state of mind shocks the conscience depends of the circumstances of a particular case." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). The initial question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). The type of conduct which is most likely to rise to the "conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Id*. at 849. Conduct which was not intentional, but rather was *deliberately indifferent*, may nevertheless rise to the conscience-shocking level in some circumstances. *Id*. at 849-50.

23

Defendants' acts and/or omissions hereinabove described, including ignoring Charlie's serious medical needs, the pleas for medical assistance coming from Charlie's family members and Officer Lopez' explicit attempt to inform dispatchers *not* to send medical assistance was egregious and outrageous behavior rising to a level that would shock the contemporary conscience. As a result, Charlie's family members were deprived of their constitutional right to familial association, society, and companionship, without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

**NINTH CAUSE OF ACTION**

**Wrongful Death**

**[Against Officer Thompson, Gustafson, Lopez and DOES 1-50]**

(Brought by Laverne Sampson, individually; Ja'Ney Sampson, individually, and Charles "Chuck" Sampson, Jr.)

Plaintiff realleges and incorporates by reference the foregoing paragraphs stated above as though fully set forth herein.

As a result of Officer Thompson, Gustafson, Lopez' and the City of El Centro's, and Does 1-50's deliberate indifference to plaintiff's serious medical needs, Charles Sampson suffered a painful, wrongful and untimely death.

**TENTH CAUSE OF ACTION**

**Negligent infliction of Emotional Distress**

**[Against Officer Thompson, Gustafson, Lopez and DOES 1-50]**

(Brought by Laverne Sampson, individually; and Charles "Chuck" Sampson)

Plaintiff realleges and incorporates by reference the foregoing paragraphs stated above as though fully set forth herein.

As set forth herein, during the course of the interrogation and detention of Charlie Sampson, his wife Laverne and his son Chuck present. They witnessed firsthand the suffering and pain that Charlie was forced to endure during his arrest and questioning. During his detention, Chuck and Laverne pleaded with the Officer

1   Thompson, Gustafson, and Lopez and the other officers directly involved in the

2   arrest and interrogation of Charlie to call an ambulance for Charlie.  When this

3   request was denied, Lavern and Chuck watched helplessly as Charlie's condition

4   worsened. Little did they know, Officer Lopez went out of his way to call dispatch

5   from his private cell phone to tell dispatchers to disregard medical calls from the

6   Sampson address. Any actions taken by the family to help Charlie were thereby

7   fruitless. Further, when Laverne tried to track down Charlie she called the jail. The

8   jail stated that Charlie had not arrived, Laverne then called ECPD, dispatchers

9   informed Laverne that her husband was being transported to the jail – when they

10   already knew that Charlie was pronounced dead at El Centro Regional.

11       That night, when they finally received word that Charlie had died in custody,

12   they realized that the last words exchanged between them were pleas for help and

13   not words of comfort.

14       The impact of what Laverne and Chuck have had to endure that evening has

15   been devastating.  Not a day goes by where the images of that evening are not

16   replayed in their minds, over and over again.  Any attempt to comfort each other is

17   futile; as they both have learned, it is impossible to give comfort when filled with

18   despair.  The extreme anguish they have suffered is matched only by their enduring

19   sense of loss.

20   **PRAYER FOR RELIEF**

21       WHEREFORE, plaintiffs pray for the following relief:

22       For compensatory, general and special damages against each defendant,

23   jointly and severally, in an amount according to proof;

24       For punitive and exemplary damages against each individually named

25   defendant in their individual capacity in an amount appropriate to punish

26   defendants and deter others from engaging in similar misconduct;

27       For costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and as

28   otherwise authorized by statute or law;

25

1    For such other relief, including injunctive and/or declaratory relief, as the

2    Court may deem proper.

3

4                              **REQUEST FOR JURY**

5        Plaintiff hereby requests a jury trial in this action.

6

7                                  MORRIS LAW FIRM, APC

8

9    Dated:  April 20, 2015              */s/Christopher S. Morris*

10                                       Christopher S. Morris, Esq.
                                         cmorris@morrislawfirmapc.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' AMENDED COMPLAINT

CASE NO. 14-CV-1807-L (DHB)